UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WELDON TWO BULLS,<br><br>Defendant. | 5:18-CR-50166-RAL<br><br><br>OPINION AND ORDER GRANTING<br>RULE 29 MOTION FOR JUDGMENT OF<br>ACQUITTAL ON COUNT II AND<br>MISTRIAL ON COUNT I |

The Government indicted Weldon Two Bulls (Two Bulls) on one count of accessory after the fact and one count of false statement. Doc. 26. This Court conducted a jury trial on March 12 and March 15, 2019. After hearing the evidence, this Court was skeptical that a reasonable jury could convict on either count and took under advisement the Defendant's Rule 29 Motion for Judgment of Acquittal. The jury stalemated on the accessory after the fact count but returned a verdict of guilty on the false statement count. Doc. 65. For the reasons explained below, this Court grants the Rule 29 Motion for Judgment of Acquittal on the false statement charge and adopts the Magistrates Judge's Report and Recommendation to grant a mistrial on the accessory after the fact charge.

I.    **Rule 29 Standard**

Under Rule 29(a) of the Federal Rule of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Under Rule 29(b), a court "may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the

1

evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." Fed. R. Crim. P. 29(b). This Court reserved ruling on the Rule 29 motion after the conclusion of the evidence.

Judgment of acquittal is appropriate "only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Hardin, 889 F.3d 945, 949 (8th Cir. 2018) (citation omitted). When considering a motion for judgment of acquittal, a district court must view the evidence in the light most favorable to the government, must resolve factual conflicts in the government's favor, and must accept all reasonable inferences that support the verdict. United States v. Benton, 890 F.3d 697, 708 (8th Cir. 2018). A court on a Rule 29 motion "is not to weigh the evidence or assess the credibility of witnesses." United States v. Bredell, 884 F.2d 1081, 1082 (8th Cir. 1989) (citing Burks v. United States, 437 U.S. 1, 16 (1978)). "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." United States v. Dupont, 672 F.3d 580, 582 (8th Cir. 2012) (per curiam) (quotation omitted). "Jury verdicts are not lightly overturned," United States v. Hood, 51 F.3d 128, 129 (8th Cir. 1995), and indeed the undersigned judge has never granted a Rule 29 judgment of acquittal previously, despite having encountered situations where this Court was skeptical that there was sufficient evidence for a reasonable jury to find defendants guilty. See, e.g., United States v. Colombe, 18-CR-30013-RAL, Doc. 234 (D.S.D. Dec. 7, 2018) (explaining denial of Rule 29 motion in case involving retaliation against a witness where sufficiency of evidence was weak but there was a view of the evidence to support the verdict). Even though "[j]ury verdicts are not lightly overturned," United States v. Shumaker, 866 F.3d 956, 960 (8th Cir. 2017) (quotation omitted),

2

"the government is not entitled to inferences based on conjecture and speculation" for a jury

verdict to stand, United States v. Aponte, 619 F.3d 799, 804 (8th Cir. 2010).

## II.    Facts and Reasonable Inferences Favorable to the Government

The Government believed that Sheena Between Lodges (Between Lodges) sometime during

the first weekend of November of 2018 was beaten by her boyfriend Gilbert "JR" Lakota (Lakota)

and his sister Lily Larvie (Larvie) and then left unconscious in a bedroom Between Lodges shared

with Lakota on the Pine Ridge Indian Reservation. Lakota and Larvie have not been indicted or

otherwise charged with any crime and have denied perpetrating any assault on Between Lodges.

Between Lodges was in a prolonged coma and has no recollection of the weekend at issue.

The Government believed that Defendant, who stayed in the house with his girlfriend Larvie

at times, was a witness to or aware of the assault on Between Lodges.[1] On December 18, 2018,

the Government indicted Defendant on a count of accessory after the fact as follows:

> On or about between November 2, 2018, and November 9, 2018, in the District of
> South Dakota, the defendant, Weldon Two Bulls, knowing that an offense against
> the United States had been committed, to wit: assault resulting in serious bodily
> injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6), did receive, relieve,
> comfort, and assist the offender, in order to hinder and prevent their trial, and
> punishment, all in violation of 18 U.S.C. § 3.

Doc. 1. Later, on January 23, 2019,[2] the Government indicted Defendant on a second count of

false statement as follows:

---

[1] During trial, it came out that the Bureau of Indian Affairs (BIA) agent mistakenly told the grand
jury in December both that Defendant said that he saw Between Lodges get dropped (when
Defendant actually said he heard others say so), and that Between Lodges had her skull bashed
and a skull fracture (which she did not). The BIA agent had heard at Indian Health Services (IHS)
that Between Lodges had a skull fracture, so that misstatement is understandable. The BIA agent,
however, had been told directly by Defendant that he had heard others say that Between Lodges
had been dropped or fell, but did not witness that occurring. Tr. Ex. 1; Doc. 67 at 3.
[2] During trial, it came out that the BIA agent falsely told the grand jury in his January testimony
that Defendant was at the home the entire weekend (he was not). The BIA agent had interviewed

On or about between November 2, 2018, and November 21, 2018, at Pine Ridge, in the District of South Dakota, the defendant, Weldon Two Bulls, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department and agency of the United States, to wit: the defendant, Weldon Two Bulls, reported to Bureau of Indian Affairs Special Agent Wesley Pacenza that he, the defendant, Weldon Two Bulls, was too intoxicated to recall what happened to Sheena Between Lodges, an assault victim, when, as the defendant, Weldon Two Bulls, then and there well knew, his statements were false, all in violation of 18 U.S.C. § 1001(a)(2).

Doc. 26. The Government did not believe that Defendant himself was involved in the assault of Between Lodges and presented no witness to seeing any assault on Between Lodges during the first weekend of November of 2018.

Between Lodges's plight became known to law enforcement as a result of a 911 call placed apparently by her boyfriend Lakota around 7:00 a.m. on Monday, November 5, 2018. Tr. Ex. 44. The caller advised dispatch of the need for an ambulance because Between Lodges had been asleep for two or three days and could not be awoken. Tr. Ex. 44. The caller said that Between Lodges had been drinking earlier before her prolonged period of unconsciousness. Tr. Ex. 44.

No one from the first responders testified at trial. Evidently, the first responders found Between Lodges unconscious in her bedroom in a home in a rural location on the Pine Ridge Indian Reservation in South Dakota. The first responders transported Between Lodges to the Indian Health Services (IHS) in Pine Ridge, South Dakota. No care provider from IHS testified. IHS evidently was told that Between Lodges had fallen, but Between Lodges had dark bruising and some aged bruises with different colorations, including bruising on her face, shoulders, neck, arm, and leg, all of which raised suspicions that Between Lodges had been assaulted. IHS requested a police officer, and Oglala Sioux Tribe Police Lieutenant Vanessa Rodriguez Dubray (Lieutenant

Defendant who described being gone one night of the weekend having borrowed Between Lodges's car, and other witnesses had corroborated that information. See Tr. Ex. 1; Doc. 67 at 3.

4

Dubray) initially responded, followed by Bureau of Indian Affairs (BIA) Agent Wesley Pacenza (Agent Pacenza).[3] Law enforcement took photographs of Between Lodges at IHS and waited for the boyfriend Lakota to arrive, but he never did. Because Between Lodges had life-threatening injuries, she was transferred to Rapid City Regional Hospital.

At Rapid City Regional Hospital, Dr. Rodney Samuelson (Dr. Samuelson), a neurosurgeon, determined that Between Lodges had a very large subdural hematoma with a 1.5-centimeter midline shift of her brain. Dr. Samuelson performed an emergency craniectomy to remove a portion of her skull to evacuate the subdural hematoma and to relieve pressure on her brain. Dr. Samuelson testified that Between Lodges had cirrhosis of the liver and liver disease that caused blood coagulation issues. Her blood coagulation issues made her bruising worse, made her bruise more easily, and made controlling bleeding more difficult. Between Lodges remained in a coma throughout her stay at Rapid City Regional Hospital and ultimately was transferred to a long-term care facility in Montana.

Dr. Samuelson opined that the injuries sustained by Between Lodges were consistent with having been assaulted. He noticed bruising across her neck that had the appearance of a strangulation injury in the area where a neck brace had been placed. Dr. Samuelson observed a new upper arm bruise with fine lines as if something other than the blood pressure cuff had been strapped tightly around the arm.[4] Between Lodges had superficial abrasions to her hands, arms, feet, and legs. Dr. Samuelson testified that a subdural hematoma could come from a fall, but Between Lodges having bruises both old and new, including a black eye, indicated that Between

---

[3] Between Lodges, Lakota, and Larvie are all "Indians," and the home where they lived and where Between Lodges was found is in "Indian country." Thus, the matter was within the jurisdiction of the Oglala Lakota Sioux Tribe and federal authorities.

[4] The matching of this upper arm bruise to a similar bruise along the flank of her back may suggest bruising from the strap of the backboard tightly wrapped around her.

Lodges had been assaulted. Part of what the Government relied upon during the trial to suggest an assault, the bruising of the right side of her head and face, however, Dr. Samuelson identified as being swelling that occurred due to and after he performed the craniectomy. Regardless, based on the photographs, Tr. Ex. 3–9, 34–36, 49, and Dr. Samuelson's opinions, a reasonable jury could have concluded that Between Lodges had been assaulted during the first weekend of November 2018.

Law enforcement then began investigating who had been around Between Lodges in the days leading up to her hospitalization. Several hearsay statements regarding what investigators were told came into evidence without objection. Agent Pacenza with assistance from Lieutenant Dubray conducted the initial investigation. On November 5, 2018, after Between Lodges had been transported to Rapid City Regional Hospital, Agent Pacenza and Lieutenant Dubray went to the home of Harry Wounded (Wounded), where Between Lodges lived and where emergency responders found her. At trial, Wounded was described as an 80-year-old man, hard of hearing, who permitted access to the home but had little helpful information. Law enforcement saw no signs of any struggle within the residence. Law enforcement took photographs of the bedroom where Between Lodges reportedly had been found and collected clothing and bedding that had some blood on it.[5] Tr. Ex. 10–18. Law enforcement learned that Between Lodges shared one bedroom with her boyfriend Lakota, that Larvie slept in another bedroom in which Defendant stayed, and that the homeowner Wounded used a third bedroom. Agent Pacenza wanted to interview Lakota and Larvie, so he left his card with Wounded.

---

[5] The clothing and bedding are at a laboratory for analysis, but no results were available at trial. Between Lodges did not have any serious injury that would cause her to bleed externally; rather, her life-threatening injury was internal bleeding.

Larvie contacted Agent Pacenza's office around 3:30 or 4:00 p.m. on November 5, 2018, and gave a recorded interview. The content of that interview was not introduced into evidence, and Larvie did not testify at trial. Larvie on the morning of November 6, 2018, called Agent Pacenza's office about bringing in her brother Lakota, and Lakota then was interviewed on the morning of November 6, 2018. Lakota's statement was not introduced into evidence and Lakota did not testify at trial. Agent Pacenza described the statements of Lakota and Larvie as "not really helpful." Law enforcement then returned to the residence to photograph stairs because of statements that Between Lodges had fallen from the stairs or had been dropped when she was passed out and being carried into the residence. Photographs of the home and the stairs were introduced at trial. Tr. Ex. 10–18, 37–42, 45–56. Because of statements that Between Lodges previously had bruised her leg on her vehicle's trailer hitch, law enforcement photographed the vehicle as well. Tr. Ex. 19–33.

On November 6, 2018, before law enforcement interviewed Defendant, Elgin Young Bear (Young Bear) called Lieutenant Dubray recounting what Young Bear had heard from Defendant. Young Bear, who lives in the community of Oglala on the Pine Ridge Indian Reservation, is a half-brother of Between Lodges and a cousin of Defendant. Young Bear knew Between Lodges to be an alcoholic, and as a recovering alcoholic Young Bear kept a distance from her. Young Bear recalled that on Sunday, November 4, 2018, Defendant visited Young Bear and his wife Wyleen Two Lance (Two Lance) at their home in Oglala. Defendant was driving Between Lodges's silver Dodge Durango and arrived alone in the vehicle. Young Bear remarked that Defendant was oftentimes "buzzed up" when he comes to visit. Defendant appeared to be hyper, could not stand still, and told Young Bear and Two Lance that Lakota and Larvie had been "ganging" (meaning beating on) Between Lodges and that Defendant had to throw off Larvie.

7

Young Bear got the impression that some assault had just occurred and was puzzled why Defendant did not have Between Lodges in the vehicle with him. Nevertheless, after Defendant's visit, Young Bear and Two Lance left for the casino rather than checking on Between Lodges. Young Bear thought Defendant's visit was on the same day that Young Bear learned of Between Lodges being transported to Rapid City Regional Hospital, which would have put the visit on Monday, November 5.[6] On Tuesday, November 6, 2018, in the morning, Young Bear talked again with Defendant, hearing Defendant say that "they" (meaning people other than Defendant) carried Between Lodges and dropped her three times, including near the cemetery. Young Bear visited Between Lodges at Rapid City Regional Hospital, believed that Between Lodges had been assaulted, and therefore notified law enforcement of his conversations with Defendant.

Young Bear's wife Two Lance testified similarly. Two Lance described Defendant as a good man who is the nicest person ever when sober, but who has a drinking problem. Two Lance remembers that it was Sunday when she was making bread and beans that Defendant knocked on the door around 4:00 or 5:00 p.m. and came in to say that Lakota and Larvie had been ganging Between Lodges and that Defendant had to throw them off. To Two Lance, Defendant seemed upset, pacing and rubbing his head. Defendant asked to borrow some money for gas for Between Lodges's Durango, and they found three dollars or so in change to give to Defendant. Two Lance knew that Defendant had a drinking problem and did not think much of what he said at the time, until after 9:00 p.m. when she learned that Between Lodges was at Rapid City Regional Hospital. Like Young Bear, Two Lance originally told the agents that Defendant had visited them at their house on Sunday, the same day they learned of Between Lodges's hospitalization; however,

---

[6] Young Bear readily admitted that he had a head injury and had difficulty remembering, but a jury could reasonably have believed Young Bear, especially since his testimony was corroborated by his wife Two Lance.

8

Between Lodges was not hospitalized until Monday, November 5, 2018, after the 7:00 a.m. call to 911. The Government maintained that Defendant's visit was on Sunday around 4:00 to 5:00 p.m., and not on Monday, and a jury reasonably could have believed that Young Bear and Two Lance were confused as to the day when they learned of Between Lodges's injuries and not as to the day when Defendant visited them. Two Lance was with her husband on the morning of Tuesday, November 6, 2018, when they spoke with Defendant about what had happened and when Defendant said that "they" (meaning others) had dropped Between Lodges three times and a fourth time on the porch.

On November 6, 2018, Agent Pacenza, with some assistance from Lieutenant Dubray, conducted a 28-minute recorded interview of Defendant outside the Wounded residence within a law enforcement vehicle. Tr. Ex. 1. This interview is the critical interview to Count II, which alleges that Defendant made a false statement to Agent Pacenza about being "too intoxicated to recall what happened to Sheena Between Lodges, an assault victim, when, as the defendant, Weldon Two Bulls, then and there well knew, his statements were false." Doc. 26. The only statements that Defendant made to Agent Pacenza were on November 6, 2018.

This Court has studied the November 6 interview of Defendant and had the entire recorded statement transcribed; at no point does Defendant actually say that he was "too intoxicated to recall what happened to Sheena Between Lodges." Tr. Ex. 1; Doc. 67. Defendant began by saying that he did not really know what happened to Between Lodges. Tr. Ex. 1; Doc. 67 at 3. Defendant reported that he had heard that Between Lodges had fallen off the porch and had been dropped a few times when brought back into the home, but Defendant did not see that occur. Tr. Ex. 1; Doc. 67 at 3. Defendant said that he had been protective of Between Lodges because she is his little cousin, but reported that Between Lodges had used her leg—a prosthetic leg due to injuries from

9

a motor vehicle accident—to strike her boyfriend Lakota. Tr. Ex. 1; Doc. 67 at 4–5. Defendant explained that Between Lodges gets drunk and sleeps for a long time. Tr. Ex. 1; Doc. 67 at 4–5. Defendant recalled being present Friday night and Saturday morning in his room watching a movie, but then thought that he had borrowed Between Lodges's car on Friday night and stayed with his father elsewhere overnight until returning the car. Tr. Ex. 1; Doc. 67 at 4, 7. When asked about borrowing Between Lodges's car overnight, Defendant said that Between Lodges looked good on Friday night, although she had a bruise on one side of her face. Tr. Ex. 1; Doc. 67 at 8. Defendant first mentioned his intoxication when speaking of not really knowing quite when he returned the car saying:

> I was kind of – I was on a drunk myself, so I really don't know. I mean but – I remember borrowing the car, and I went straight down to Number 4.[7] And then she [meaning Between Lodges] was – she said yeah, go ahead, just make sure you put gas in it.

Tr. Ex. 1; Doc. 67 at 9. Defendant believed the ambulance had come for Between Lodges on Sunday, but Agent Pacenza told Defendant "that was yesterday," meaning Monday. Tr. Ex. 1; Doc. 67 at 9. Then the Defendant said:

> A. [by Defendant] Yeah. And like I said, I kind of lost a couple of days there.
>
> Q. Because why?
>
> A. I said I kind of lost a couple of days there. I was having beers, so –

Tr. Ex. 1; Doc. 67 at 9–10. Later Lieutenant Dubray asked about Defendant drinking on Monday night, but Defendant clarified that he drank the night before, down at Number 4; Defendant identified with whom he had been drinking, and the group did not include Lakota, Larvie, or Between Lodges. Tr. Ex. 1; Doc. 67 at 14. Defendant at no point said that he was too intoxicated

---

[7] Number 4 is a housing area on the Pine Ridge Indian Reservation apart from the area of the Wounded residence, and Defendant sometimes stayed at Number 4.

to recall what happened to Between Lodges, but explained that she was fine when he borrowed her car other than a bruise to her face and that she was unconscious when he returned the car after having drank and spent a night at a different house. Tr. Ex. 1; Doc. 67. Defendant said that he never saw anyone hit Between Lodges and that he thought Between Lodges was just sleeping when he returned the car. Tr. Ex. 1; Doc. 67 at 4–6, 10, 17. When law enforcement asked Defendant about his contact with Young Bear, Defendant said that he told Young Bear that he heard that Between Lodges had fallen off the porch, that he was getting updates from Young Bear on Between Lodges's condition, and that he had talked with Young Bear the previous Friday night about borrowing money for gas. Tr. Ex. 1; Doc. 67 at 11–12, 14–15. At the end of the interview, Defendant reiterated that he did not know what had happened to Between Lodges. Tr. Ex. 1; Doc. 67 at 26.

Both Agent Pacenza and Lieutenant Dubray described Defendant as cooperative during his interview. Lieutenant Dubray observed that Defendant became more nervous and his demeanor changed when his girlfriend Larvie showed up near the vehicle in the middle of the interview, and that Larvie was walking around the vehicle and loud during part of the interview.

Between Lodges herself testified at trial. She now is wheelchair bound as a result of the serious head injury that she sustained. She has no recollection of the first weekend of November of 2018. She recalled living in the Wounded home and who lived there. Between Lodges testified that she had a good relationship with Lakota, but that she had told people that Lakota had hit her and caused black eyes and that he once strangled her. Between Lodges had known Defendant all of her life and recalled one instance where Defendant intervened to stop Larvie from hitting her about a year before the trial (which would have been around March of 2018). Between Lodges remembered Larvie being violent to her on a couple of occasions.

11

Two friends of Between Lodges testified about the days leading up to her injury. Missy Goings (Goings) was a close friend of Between Lodges during the summer of 2018. On Tuesday, October 30, 2018, Goings was drinking alcohol with Between Lodges, Lakota, and Oscar Saucedo (Saucedo), with Between Lodges's baby present as well. The group drank a half gallon of vodka together and Between Lodges passed out in her Durango. Goings remembered that Between Lodges's prosthetic leg came off in the vehicle, that she had a light black eye, and that she had to be carried into her home. Goings did not see Between Lodges being dropped when she was carried into the home. Between Lodges was placed in her bedroom, and both Lakota and Saucedo passed out as well in the house. Defendant was in the house that night because Goings remembered him coming out of another bedroom, getting a drink of water, and talking with her briefly.

The next day, October 31, 2018, Goings saw Between Lodges around 6:00 p.m., when Between Lodges, her baby, Saucedo, and Lakota pulled up in the Durango at Goings's home. Goings saw no bruises on Between Lodges. Goings had to take her kids trick-or-treating, so she did not join the group to drink that night.

Goings next saw Between Lodges around 9:00 p.m. on Friday, November 2, 2018, when Goings went outside of her home to take the trash out. Saucedo had driven up to Goings's home in Between Lodges's Durango. At that time, Lakota and Between Lodges both were passed out in the vehicle, and Goings noticed no bruising on Between Lodges when she looked into the vehicle. Saucedo stayed about ten or fifteen minutes, drank alcohol with Goings, and then left. Goings did not see Between Lodges thereafter.

Saucedo testified that he is a cousin of Lakota and knows Between Lodges through Lakota. Saucedo knew Defendant as the boyfriend to Lakota's sister Larvie. Saucedo confirmed that on Tuesday, October 30, 2018, he was in Between Lodges's Durango with Lakota, Goings, Between

Lodges, and her baby. Saucedo remembered that they had car trouble on that night, that all were drinking heavily, that Between Lodges passed out and did not have her prosthetic leg on at that point, and that Lakota carried Between Lodges into the home. Saucedo did not see Between Lodges fall or get dropped and had carried the baby in following Lakota. When Saucedo woke up at 5:00 a.m. on Wednesday, October 31, 2018, everyone was sleeping, and Saucedo left. Later that day, Lakota called and Saucedo helped him get a new car battery, gas, and beer.

On Thursday, November 1, 2018, Saucedo recalls using Between Lodges's vehicle that day and drinking with others into the early morning of November 2, 2018, until around 5:00 or 6:00 a.m. On Friday, November 2, 2018, Saucedo had to watch his own daughter. Saucedo was "hanging over" and still had Between Lodges's Durango on Friday afternoon. Between Lodges came over to reclaim the vehicle and seemed to be perfectly fine at that time.

On Saturday, November 3, 2018, Saucedo did not see Between Lodges. Saucedo noticed Between Lodges's Durango being driven by Defendant Saturday afternoon, perhaps clarifying that Defendant borrowed the vehicle for Saturday and Sunday. If both Saucedo and Goings are correct in their timeline, which the jury reasonably could have believed, Between Lodges was uninjured on Friday afternoon, November 2, 2018, when she retrieved her vehicle from Saucedo, and Defendant borrowed Between Lodges's Durango no earlier than Friday evening and had the vehicle by Saturday afternoon, November 3, 2018.

On Sunday, November 4, 2018, Saucedo recalls Lakota calling him and saying that Between Lodges had not woken up. Between 6:00 and 8:00 p.m., Lakota called Saucedo to say that Defendant had been gone with Between Lodges's Durango all day and that Lakota wanted the vehicle back. Saucedo called Defendant then and told him to return the vehicle or else Between Lodges would call the police to get the vehicle back. Saucedo visited the home where Between

Lodges was unconscious on the evening of Sunday, November 4, 2018. Saucedo looked in on Between Lodges and thought her to be asleep in her bedroom. Saucedo was familiar that Between Lodges could sleep a day at a time when she was really drunk. Saucedo was at the home when Defendant drove up in Between Lodges's vehicle. Defendant appeared to Saucedo to be drunk. Saucedo presumed that someone was going to take Between Lodges to the hospital at that point and left the home after Defendant had arrived. If both Saucedo and the pair of Young Bear and Two Lance are correct on their timelines, Defendant returned the vehicle on Sunday evening, November 4, 2018, when Between Lodges had been unconscious for some hours.

BIA Agent Darrell Robinson conducted a second interview of Defendant on November 21, 2018, with Agent Lawrence present. Tr. Ex. 2; Doc. 67-1. This Court had the entirety of that recorded interview transcribed as well. See Tr. Ex. 2; Doc. 67-1. This second interview is not the subject of Count II, in that the false statement alleged in Count II was made to Agent Pacenza, and Agent Pacenza was not involved in the November 21, 2018 interview of Defendant. This November 21 interview also is not the subject of Count I charging accessory after the fact, which alleges conduct by Defendant on or between November 2, 2018, and November 9, 2018. During the second interview, Defendant remained uncertain as to what day he had borrowed Between Lodges's Durango and what night he spent elsewhere. Tr. Ex. 2; Doc. 67-1. Defendant thought he possibly borrowed the vehicle Thursday or Friday night, returning on Saturday night. Tr. Ex. 2; Doc. 67-1 at 4. Once prompted that Between Lodges had gone to the hospital on Monday, Defendant thought that he had borrowed the car Friday night and been gone all day Saturday. Tr. Ex. 2; Doc. 67-1 at 5. Defendant was certain that Between Lodges was all right when he borrowed the car, but was not sure whether she was drunk at the time. Tr. Ex. 2; Doc. 67-1 at 6–7. Defendant

believed that he must have been sleeping when the ambulance came to the house to get her on Monday morning. Tr. Ex. 2; Doc. 67-1 at 7–8.

Defendant during the November 21 statement recalled Lakota trying to awaken Between Lodges and having told Defendant that they had carried her in and dropped her off the porch. Tr. Ex. 2; Doc. 67-1 at 8–9. Defendant was more candid during the second interview about possible domestic violence between Lakota and Between Lodges, saying that they had fought and argued, but that he never saw Lakota being physical to Between Lodges around him, though he once had told Lakota not to hit her. Tr. Ex. 2; Doc. 67-1 at 9–10. Defendant acknowledged that Between Lodges had black eyes in the past and that he allowed her to stay at Number 4 housing at his place when things got bad. Tr. Ex. 2; Doc. 67-1 at 31. Between Lodges had told him that Lakota would beat her up, and Defendant had told Lakota that if he ever caught him hitting Between Lodges, he would do something about it. Tr. Ex. 2; Doc. 67-1 at 31–32. Defendant explained that he had a house at Number 4 housing and sometimes stayed there, although he had been staying with Larvie as well in the Wounded home. Tr. Ex. 2; Doc. 67-1 at 9, 14.

Defendant during the November 21 statement expressed surprise that two people said that Defendant reported having to break up Lakota and Larvie assaulting Between Lodges. Tr. Ex. 2; Doc. 67-1 at 19. Defendant responded, "I said this?" "When?" "I don't recall anything about that." Tr. Ex. 2; Doc. 67-1 at 19–20. When asked again about having told two people that he had to stop Lakota from beating up Between Lodges, Defendant continued, "I don't know about that. I don't know anything about that. I never seen him try to beat her up during that time." Tr. Ex. 2; Doc. 67-1 at 20. Defendant then said that he was pretty "tuned up" during part of the weekend. Tr. Ex. 2; Doc. 67-1 at 20. Defendant thought that it was Lakota[8] who had called him to demand

---

[8] Saucedo actually made that call to Defendant on behalf of Lakota.

that the car be brought back and could not recall if that was on Sunday. Tr. Ex. 2; Doc. 67-1 at 7. He again recalled returning the Durango and thinking that Between Lodges was passed out, seeing her sleeping on her bed. Tr. Ex. 2; Doc. 67-1 at 26. Defendant did not recall if Saucedo was there at the time. Tr. Ex. 2; Doc. 67-1 at 28. Defendant denied trying to protect anyone with this statement. Tr. Ex. 2; Doc. 67-1 at 33.

Defendant did not testify at trial. The only testimony about Defendant's intoxication over the relevant weekend came from Saucedo who thought him drunk on Sunday night when returning the car and from Between Lodges's relatives who said Defendant was prone to drink.

## III.  Discussion

### A. Count I–Accessory After the Fact

The elements of accessory after the fact as charged in Count I of the superseding indictment were:

> *One*, Gilbert Lakota and Lily Larvie committed the offense of assault resulting in serious bodily injury;
>
> *Two*, the defendant, Weldon Two Bulls, knew that Gilbert Lakota and Lily Larvie committed the offense of assault resulting in serious bodily injury; and
>
> *Three*, after the crime on or about between November 2, 2018, and November 9, 2018, the defendant helped, received, relieved, comforted or assisted Gilbert Lakota and Lily Larvie in order to prevent their arrest, trial or punishment.

Doc. 59 at 7; see 18 U.S.C. § 3. The jury deadlocked on this count.

The jury note, Doc. 60, indicated that the jury was struggling with the first element that Lakota and Larvie, beyond a reasonable doubt, committed the offense of assault resulting in serious bodily injury on Between Lodges. The nature and extent of Between Lodges's bruising provides circumstantial evidence of an assault, even though Between Lodges's liver condition predisposed her to bleeding and bruising easily. Between Lodges certainly sustained serious

16

bodily injury somehow, and there was some evidence, if Between Lodges's memory is reliable, that Lakota and Larvie had assaulted her in the past and that Defendant had intervened in or around March of 2018 to break up an instance where Larvie was hitting Between Lodges. Plus, there is what Young Bear and Two Lance heard Defendant to say, albeit not under oath and later denied by Defendant, that Defendant saw Lakota and Larvie "ganging" Between Lodges and stopped it from continuing. While the evidence is thin, a reasonable jury could infer that Lakota and Larvie assaulted Between Lodges causing serious bodily injury.

On the second element of Count I, the only evidence that Defendant knew of the assault was Defendant's statement to Young Bear and Two Lance. Defendant's statement to Young Bear and Two Lance did not include when the assault he presumably broke up occurred, and Between Lodges herself remembers such a circumstance about a year before the trial in March of 2018, well removed from the weekend when she sustained serious bodily injury. The evidence at trial suggested that Defendant was gone with Between Lodges's vehicle and overnight away from the Wounded home for at least part of the time period when Between Lodges must have sustained injury. Saucedo testified that at Lakota's request he called Defendant on Sunday early evening to demand return of the vehicle because Defendant had kept it longer than Lakota expected. Saucedo was at the Wounded home in the evening of Sunday, November 4, 2018, when Defendant returned with the car, and Saucedo thought Defendant to be intoxicated at that time. By that point, Saucedo's testimony establishes that Between Lodges already was unconscious in her bedroom. Defendant looked into the room and saw Between Lodges unconscious there, thought (like Saucedo did) that she was sleeping off a period of intoxication, and went to bed himself. The question then becomes when did Defendant borrow the vehicle in the first instance and whether that was before or after Between Lodges sustained serious bodily injuries presumably as a result

17

of an assault. Defendant consistently told law enforcement that Between Lodges looked fine to him when she gave permission for him to take the vehicle, and that it may have been Friday night when he borrowed her Durango. The Government's evidence corroborated that Defendant had Between Lodges's vehicle for at least parts of Saturday and Sunday. There was no evidence that Defendant returned to the Wounded house with the vehicle before Sunday evening when Between Lodges was already unconscious. The only evidence that Defendant could have been present when any assault occurred is the statement he made to Young Bear and Two Lance that Defendant had seen Lakota and Larvie "ganging" Between Lodges and broke it up. To reach a conclusion that Defendant knew Lakota and Larvie committed an assault resulting in serious bodily injury involves some inferences from the evidence, but ones that cannot be ruled out given the Defendant's statement to Young Bear and Two Lance and given Between Lodges's injuries.

The third element of the offense charged in Count I also presented problems with proof. The Government made clear during the trial that the manner in which Defendant was an accessory after the fact between November 2, 2018, and November 9, 2018, was through his false statement to Agent Pacenza. For the reasons explained when analyzing Count II, Defendant never made the particular statement to Agent Pacenza that the Government indicted as being false. Defendant's interview with Agent Pacenza was recorded and at no point did Defendant say that he was too intoxicated to recall what happened to Between Lodges. Rather, Defendant described Between Lodges being fine when he borrowed her vehicle and being unconscious—Defendant thought sleeping—when he returned to the Wounded home the next evening with the vehicle. He blamed his intoxication for not being confident of what days he had the vehicle, not as an excuse for not knowing what happened to Between Lodges.

Defendant however did make other statements during his November 6 interview inconsistent with his later November 21 interview that could be viewed as covering up for past domestic violence toward Between Lodges or blaming Between Lodges for past domestic violence toward Lakota. Making false statements designed to help another avoid criminal apprehension is one way in which a person can become an accessory after the fact. See United States v. White, 771 F.3d 225, 232–34 (4th Cir. 2014) (declining to grant a Rule 29 motion when defendant made false statements wrongfully blaming a tenant for a fire to avoid apprehension of the person whom defendant had hired to commit arson of defendant's own building for insurance proceeds); United States v. Prescott, 581 F.2d 1343, 1353 (9th Cir. 1978) (holding that lying to investigators is circumstantial evidence of intent to act as an accessory after the fact when the defendant "received [the principal] in her apartment, together with the fruits of his crimes"). For the Government to justify conviction of Defendant as an accessory after the fact based on a false statement, the Government must show that Defendant's statements to investigators not only helped or assisted Lakota and Larvie, but also were made "in order to hinder or prevent [Lakota and Larvie's] apprehension, trial or punishment" for Between Lodges's assault resulting in serious bodily injury that took place "on or about between November 2, 2018 and November 5, 2018." Doc. 59 at 7; 18 U.S.C. § 3. While the evidence is thin on Defendant behaving in a way to be an accessory after the fact, this Court thinks it improper to grant the Rule 29 motion. Giving false or misleading information to law enforcement could be a way of helping or assisting a person in order to have the person avoid arrest or punishment. Accordingly, this Court denies the motion for judgment of acquittal on Count I under Rule 29.

Under Rule 26.3 of the Federal Rules of Criminal Procedure, this Court can grant a mistrial. When a jury is unable to agree on a verdict, the grant of a mistrial has long been the customary

remedy. United States v. Perez, 22 U.S. 579, 580 (1824); see Sattazahn v. Pennsylvania, 537 U.S. 101, 121 (2003) ("A hung jury . . . justifies a trial court's declaration of a mistrial and the defendant's subsequent reprosecution."). The Report and Recommendation of the Magistrate Judge is to enter an Order of Mistrial on Count I, unless this Court grants the Rule 29 motion. Doc. 68. This Court agrees with the Magistrate Judge's conclusions and grants a mistrial for Count I. The Government should think long and hard about whether retrial of the accessory after the fact charge serves the interests of justice in this case.[9] The Government's case on Count I only narrowly survived the Rule 29 motion and might not do so again, depending on testimony at any retrial.

## B. Count II–False Statement

Count II alleged a false statement to Agent Pacenza that Defendant was "too intoxicated to recall what happened to Sheena Between Lodges, an assault victim, when, as the defendant, Weldon Two Bulls, then and there knew, his statements were false." This Opinion and Order details what Defendant said to Agent Pacenza on the one and only time they spoke—November 6, 2018—and that statement was audio recorded. Tr. Ex. 1; Doc. 67. That audio recording was entered into evidence, and this Court has had it transcribed. Tr. Ex. 1; Doc. 67. Defendant spoke of his intoxication in the context of struggling to remember when he borrowed and when he returned Between Lodges's vehicle, but never said that he was too intoxicated to recall what happened to Between Lodges. Rather, he repeatedly said he did not know what happened to

---

[9] A federal magistrate judge twice refused to issue an arrest warrant for Defendant under Rule 4(a) on a complaint and affidavit due to the absence in the magistrate judge's view of probable cause. The BIA officer misstated certain evidence when testifying to the Grand Jury on two occasions in support of an indictment. And the Government after all is charging in the Defendant the individual whom the Government believes to have broken up the assault on Between Lodges, albeit under the Government's view of the evidence without calling for help for her or truthfully reporting what happened.

Between Lodges and reported what others said about her being dropped or falling. See Doc. 67 at 3 ("And from what I *heard* is that she fell off the porch." (emphasis added)); Doc. 67 at 6 ("I wasn't here, but from what I *heard* she fell off the porch . . . ." (emphasis added)). That is, Defendant blamed drinking for his lack of memory of what days he had Between Lodges's vehicle, but not as a reason he did not know what happened to Between Lodges as alleged in Count II. Tr. Ex. 1; Doc. 67.

Even if Defendant had made the statement that he "was too intoxicated to recall what happened to Sheena Between Lodges," a rational trier of fact probably could not find beyond a reasonable doubt that the statement was false and the Defendant knew it was untrue. The Government did not claim that Defendant lied about being intoxicated for part of the weekend; the Government called Two Lance who testified that Defendant had a drinking problem and Saucedo who confirmed that Defendant appeared intoxicated on Sunday evening when he returned the vehicle. The people with whom Defendant was drinking that weekend were not called as witnesses. Defendant's report of intoxication affecting his memory of when he borrowed and returned the car probably were truthful statements.

The jury nevertheless returned a guilty verdict, which prompted this Court to look at its instructions on the elements of Count II and realize that the Court unintentionally (and drawing from the Government's proposed instruction, Doc. 39) deviated in the elements instruction from the crime charged in Count II. The Government had proposed as an instruction on the first element of Count II the following:

> First, on or about between November 2, 2018, and November 21, 2018, the defendant knowingly, voluntarily and intentionally made a false statement or representation to Bureau of Indian Affairs Special Agents, that he had no knowledge of an assault on Sheena Between Lodges.

Doc. 39 at 4. The Government's proposed instruction enlarged substantially Count II of the Indictment, which charged a false statement "to Bureau of Indian Affairs Special Agent Wesley Pacenza that [defendant] was too intoxicated to recall what happened to Sheena Between Lodges . . . ." Doc. 26. This Court corrected one of the two problems with that proposed instruction— varying from the indicted false statement of being "too intoxicated to recall what happened to Sheena Between Lodges"—but did not catch the other variance from the Indictment—broadening the crime to include possible false statements to other BIA agents. The defense attorney did not object to the instruction that the Court gave on the elements of this crime, which was:

> *One*, on or about between November 2, 2018, and November 21, 2018, the defendant, Weldon Two Bulls, knowingly and intentionally made a statement or representation to Bureau of Indian Affairs Special Agents,[10] that he was too intoxicated to recall what happened regarding an assault on Sheena Between Lodges;
>
> *Two*, the statement or representation was false or fraudulent;
>
> *Three*, the defendant knew it was untrue when he made the statement or representation;
>
> *Four*, the statement or representation concerned a material fact; and
>
> *Five*, the statement or representation was a matter within the jurisdiction of the Bureau of Indian Affairs.

Doc. 59 at 9; see 18 U.S.C. § 1001(a)(2).

This broadening of what was indicted as Count II is not innocuous. Defendant spoke to Agent Pacenza just once on November 6, 2018, and did not make the statement Count II of the Indictment alleged to have been made. Defendant spoke with two separate BIA agents on November 21, 2018, and, while not making the statement that he was "too drunk to recall what

---

[10] This should have read "to Bureau of Indian Affairs Special Agent Wesley Pacenza" and to avoid confusion perhaps should have referenced the only day on which Defendant spoke to Agent Pacenza—November 6, 2018.

happened to Sheena Between Lodges," did make statements about hearing of domestic violence on prior instances so bad that Defendant would offer to have Between Lodges stay at Defendant's home at Number 4. Tr. Ex. 2; Doc. 67-1 at 9.

A court typically would analyze whether the error in the jury instruction is a constructive amendment of the indictment or a variance. A constructive amendment changes the charge, violates the Fifth Amendment right to indictment by grand jury, and is reversible error per se. United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000). A variance changes the evidence while the charge remains the same, presents a Sixth Amendment issue of the right to be informed of the nature of the charges, and is subject to the harmless error standard. Id. This situation probably is more of a variance than constructive amendment. See United States v. Morrissey, 895 F.3d 541, 553 (8th Cir. 2018); United States v. Farish, 535 F.3d 815, 821–22 (8th Cir. 2008). However, the issue of constructive amendment or variance is academic because no reasonable jury properly instructed on the law could conclude that Defendant made a false statement that he "was too intoxicated to recall what happened to Sheena Between Lodges" to Agent Pacenza when the recording of the only interview by Agent Pacenza of Defendant contains no such statement. See United States v. Miller, 178 F. Supp. 3d 1114, 1119–20 (D. Colo. 2016) (ruling on a Rule 29 motion by comparing the evidence to the allegations in the indictment rather than the improperly amended jury instructions).

## IV.    Conclusion and Order

Therefore, it is hereby

ORDERED that the Rule 29 Motion is granted on Count II and Judgment of Acquittal for Defendant enter on Count II. It is further

ORDERED that the Report and Recommendation, Doc. 68, for Mistrial on Count I is adopted, and a mistrial is declared on Count I due to the jury deadlocking on that count.

DATED this 22nd day of April, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE